Eric **STEWARD,** by his next friend and Mother, Lillian Minor, et al., Plaintiffs,

v.

Greg **ABBOTT,** Governor of the State of Texas, et al., Defendants.

The United States of America, Plaintiff Intervenor,

v.

The State of Texas, Defendant.

**Civil No. 5:10-cv-1025-OLG**

United States District Court, W.D. Texas, San Antonio Division.

Signed 05/17/2016

---

Casey A. Burton, Robert Velevis, Yvette Ostolaza, Sidley Austin LLP, Dallas, TX, Deborah A. Dorfman, Elizabeth F. Toner, Sandra J. Staub, Steven J. Schwartz, Northampton, MA, Sean A. Jackson, Disability Rights Texas, Houston, TX, Garth A. Corbett, Disability Rights Texas, Austin, TX, for Plaintiffs.

Alexandra L. Shandell, Benjamin Ogle Tayloe, Cynthia Coe, Haley Christine Van Erem, Jessica Elyse Polansky, Regan Rush, Robert A. Koch, U.S. Department of Justice, Washington, DC, John F. Paniszczyn, U.S. Attorney's Office, San Antonio, TX, for Plaintiff-Intervenor.

Andrew S. Oldham, Andrew Bowman Stephens, Angela V. Colmenero, John Earl Duke, Marc Edward Rietvelt, Michael James Patterson, Nancy K. Juren, Natalee B. Marion, Thomas A. Albright, Scott A. Keller, Office of the Attorney General, Austin, TX, for Defendants.

## ORDER

ORLANDO L. GARCIA, UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' motions (docket nos. 242, 244) seeking the dismissal of Plaintiffs' and Intervener's claims against them. The Court has reviewed these motions, together with the arguments raised by the parties in their memoranda, responses, and replies (docket nos. 255, 260, 264, 274, 278), the record in this case, and the applicable law, and concludes, for the reasons set forth below, that Defendants' motions to dismiss should be DENIED.

## BACKGROUND

Plaintiffs are twelve individuals who allege that they suffer from intellectual or developmental disabilities and related conditions (IDD), and two organizations, The Arc of Texas, Inc., and the Coalition of Texans with Disabilities, Inc. Defendants are the State of Texas, and, in their official capacities, Governor Greg Abbott, Texas Health and Human Services Commission

Executive Commissioner Kyle Janek, and Texas Department of Aging and Disability Services Commissioner Jon Weizenbaum. Plaintiffs allege that Defendants have administered the Medicaid program such that, in order to continue receiving Medicaid-funded services that they depend upon, Plaintiffs have been unnecessarily institutionalized and segregated in nursing facilities and excluded from community-based supports, including the Home and Community-based Services (HCS) waiver program. Plaintiffs allege that Defendants' administration of the Medicaid program violates Title II of the American with Disabilities Act (ADA), the Rehabilitation Act, the Medicaid Act, and the Nursing Home Reform Amendments Act (NHRA). Plaintiffs are joined by Plaintiff-Intervenor the United States.

Defendants have moved to dismiss the United States (docket no. 242), arguing that the United States lacks standing to assert claims under Title II of the ADA and the Rehabilitation Act. Defendants have also moved to dismiss Plaintiffs' claims, arguing that all Plaintiffs lack standing as to all of their claims, and that, as to every count of the complaint, all Plaintiffs have failed to state a claim upon which relief can be granted.

## LEGAL STANDARDS AND ANALYSIS

### A. Texas's Motion to Dismiss the Claims of the United States

In its motion to dismiss the claims in intervention of the United States, Texas argues that, because Congress has not authorized the Attorney General to sue under Title II of the ADA, the enforcement provision of the Rehabilitation Act, or Title VI of the Civil Rights Act, the United States lacks standing to sue and should be dismissed from the case. Docket no. 242 at 1-2.

■ To the extent that Texas's argument for dismissal goes to Article III standing, it fails because the United States, as an intervenor who seeks no relief beyond that sought by the Plaintiffs in this case, need not possess Article III standing to proceed. It is the law of this circuit that "Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so." *Ruiz v. Estelle,* 161 F.3d 814, 829–30 (5th Cir.1998); *Newby v. Enron Corp.,* 443 F.3d 416, 422 (5th Cir.2006); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,* 659 F.3d 421, 428 (5th Cir.2011).

■ The United States' complaint in intervention seeks injunctive relief and declaratory relief that is substantially the same ultimate relief sought by the original Plaintiffs in this case. *Cf.* docket nos. 1 at 54-56, 53-1 at 18, 137 at 17, 173 at 84-86; *see also Ruiz,* 161 F.3d at 833 (where the intervening plaintiffs "seek the same ultimate relief" as the original plaintiffs, but advance a different legal theory, the intervening plaintiffs' complaint "creates no jurisdictional obstacle for the court"); *see also McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 233, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) ("The National Right to Life plaintiffs argue that the District Court's grant of intervention to the intervenor-defendants ... must be reversed because the intervenor-defendants lack Article III standing. It is clear, however, that the Federal Election Commission (FEC) has standing, and therefore we need not address the standing of the intervenor-defendants, whose position here is identical to the FEC's."), *overruled on other grounds by Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

■ The State of Texas argues that "the question is not whether the United States permissibly piggybacked on Plaintiffs' standing when it intervened, but rather, having intervened, where does the Attorney General's right to assert its claims come from?" Docket no. 278 at 3. Insofar as this argument pertains to Article III standing, it is misguided. The Court is not tasked with screening individual parties' rights to assert their claims, but with safeguarding separation of powers by "ensur[ing] that courts will decide only actual disputes and not abstract policy questions more properly decided by coordinate branches of government." *Ruiz*, 161 F.3d at 829, 832. Provided that such a case or controversy exists, it is immaterial to the court's jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements of Article III. *Id.* at 823–33 (rejecting argument that intervenor-plaintiffs required standing to invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's jurisdiction in this case has already been invoked by the original parties").

■ To the extent that Texas's argument for dismissing the claims of the United States goes to doctrines of "prudential" or statutory standing, it fails for similar reasons. A government agency's capacity to intervene—and to raise claims that are within the scope of the original plaintiff's complaint—is not limited to the agency's capacity to institute an independent action on its own behalf. *In re Estelle*, 516 F.2d 480, 485 (5th Cir.1975) ("the intervenor-by-permission does not even have to be a person who would have been a proper party at the beginning of the suit[.]") (sep-arate opinion of Turtle, J.); *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 92 (3d Cir.1979) ("we need not decide whether absent the [original] action the United States could independently have sued. ... Congress has made the decision that someone could seek the injunctive relief in question. Intervention presented no danger that the federal executive would be initiating a lawsuit that Congress somehow never intended.") *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

"[T]he whole thrust of the amendment [adding Fed. R. Civ. P. 24(b)(2)] is in the direction of allowing intervention liberally to governmental agencies and officers seeking to speak for the public interest." 7C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1912 (3d ed. 1998) (discussing *Sec. & Exch. Comm'n v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 460, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940)); Fed. R. Civ. P. 24 advisory committee's note to 1946 amendment (same) (discussing *Realty*). As noted above, this is not a case in which the relief sought by the United States exceeds the scope of relief sought by the original Plaintiffs. This is, however, a case in which the original Plaintiffs' claims, and the defenses asserted by the State of Texas and the other Defendants, arise from a statutory and regulatory regime that the Attorney General has been charged by Congress with administering.[1] The Court has already granted the United States' motion to intervene, and "its pleadings [are] congruent to the pleadings of the Plaintiff." *Disability Advocates, Inc. v. Paterson*, No. 03–CV–3209 (NGG), 2009 WL 4506301, at *3 (E.D.N.Y. Nov. 23, 2009). The interests of

---

1. Texas has acknowledged that Title II of the ADA and the Rehabilitation Act do authorize the Attorney General to sue. Docket no. 56 at 5, 10 ("the United States has an 'interest' in Title II of the ADA"; "both Title II and the Rehab Act allow for enforcement through the termination or refusal to grant federal funding, or by 'any other means provided by law'... Courts interpret 'any other means provided by law' to authorize DOJ enforcement via federal court action.") (citing 42 U.S.C. § 2000d–1).

the United States in the enforcement of Title II and the Rehabilitation Act provide a sufficient basis for the United States to raise claims that do not exceed the scope of the original Plaintiffs' complaint. It has done so. At this juncture, the Court need not consider whether the United States could go further. Therefore, the Court need not and does not reach Texas's arguments about the Attorney General's authorization to sue under Title II of the ADA or the Rehabilitation Act. Texas's motion to dismiss the claims of the United States (docket no. 242) is DENIED.

### B. Texas's Motion to Dismiss Plaintiffs' Second Amended Complaint

The Court now turns to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (docket no. 244). In their opposition to the motion to dismiss, Plaintiffs note that they are no longer pursuing their Medicaid Act "comparability" claims or their claims against the Governor. Docket no. 264 at 4 n.2. The Court finds Defendants' arguments for dismissal of Plaintiffs' claims to be without merit, and concludes that Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (docket no. 244) should be DENIED for the reasons set forth below.

### 1. Standing

■ First, Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1), arguing the Court lacks subject matter jurisdiction because both the organizational and the individual plaintiffs have failed to establish standing.[2] In resolving a motion under Rule 12(b)(1), the Court may find a lack of subject matter jurisdiction in the complaint alone, the complaint supplemented by undisputed facts in the record, or the complaint supplemented by undisputed facts in the record plus the court's

resolution of disputed facts. A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001); *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981).

■ Defendants precede their standing arguments with a threshold argument: that the Court, in assessing Plaintiffs' standing, should "ignore" the declarations (docket nos. 264-1 to 264-7) that Plaintiffs submitted in opposition to Defendants' motion to dismiss because the declarations were made out, "under the penalty of perjury[,]" to be "true and correct to the best of [the declarants'] knowledge." *See* docket no. 270 at 3. Defendants support this argument with the holding of the Fifth Circuit in *Nissho-Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir.1988), but their argument misconstrues the relevant holding. In that case, the court discussed the sufficiency of summary judgment affidavits and, alternatively, declarations that are admissible as summary judgment evidence under 28 U.S.C. § 1746. In that case, a purported affidavit, defective because unsworn, was also ineffective as a declaration under Section 1746 because it did not contain language substantially similar to the operative language of that statute; i.e., it was not declared "under penalty of perjury" to be "true and correct." *Kline,* 845 F.2d at 1306; 28 U.S.C. § 1746. The declarations in this case, which Defendants urge the Court to "ignore," do contain the operative language of Section 1746, and no authority relied upon by Defendants supports their position that the qualifying phrase "to the best of my knowledge" in-

---

**2.** The Court will address Defendants' argument about Plaintiffs' standing to bring "freedom of choice" claims under 42 U.S.C.

§ 1396n(c)(2)(B) and (C) in the section discussing the existence of a private right of action under that statute.

validates a declaration that is otherwise valid under Section 1746. *Cf.* Fed. R. Civ. P. 56(c)(4) (requiring that an affidavit or declaration be based upon "personal knowledge"). Rather, the cases Defendants cite addressed a series of purported affidavits or declarations and rejected them where—in the absence of any mention of perjury—they were verified only by the declarant's statement to the effect that the contents were true to the best of the declarant's knowledge. In other words, those cases held, quite plainly, that unsworn declarations are insufficient if not phrased in a manner that subjects the declarant to the penalty of perjury. *Kline,* 845 F.2d at 1306 ("affidavit is not in substantial conformity with either formula because, as drafted, it allows the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods"); *Barraza v. United States,* 526 F.Supp.2d 637, 641 (W.D.Tex.2007) (same; "It is essential that statements be under penalty of perjury in order to ensure that affiants cannot circumvent the penalties for perjury in signing onto intentional falsehoods."); *Yett v. Peters,* No. 4:08–cv–034–A, 2008 WL 2815587, at * 1 (N.D.Tex. July 7, 2008) (same); *King v. San Joaquin Cty. Sheriff's Dep't* 2009 WL 577609, at *3 (E.D.Cal. Mar. 5, 2009) *report and recommendation adopted,* 2009 WL 959958 (E.D.Cal. Apr. 6, 2009) (same). Having reviewed the authorities relied upon by Defendants, the Court is not persuaded by Defendants' argument, and declines to exclude or otherwise discount the declarations submitted by Plaintiffs.[3]

Defendants also argue, as an initial matter, that Plaintiffs' complaint should be dismissed for lack of standing because the remedy it seeks is "overly broad" in violation of the standards discussed in *Lewis v. Casey,* 518 U.S. 343, 360, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) and "unenforceable" in violation of Fed. R. Civ. P. 65(d). Like Defendants' argument for excluding Plaintiffs' declarations, this argument rests upon Defendants' misconstruction of the relevant law. Both *Lewis* and Rule 65(d) address the enforceability of a remedy, not the sufficiency of a pleading. They stand for the propositions that a remedy is defective, based upon Article III concerns, to the extent that it exceeds the scope of the injury established by a plaintiff, *Lewis,* 518 U.S. at 357–58, 116 S.Ct. 2174, and that injunctive relief is ineffective to the extent that it does not describe "in reasonable detail ... the acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). No authority cited by Defendants support their position that a complaint may be dismissed for lack of subject matter jurisdiction if the prayer for relief in the complaint would be unenforceable if adopted verbatim as a court order. Any challenge to the relief that may be granted by this Court must wait until the Court has actually granted whatever relief, if any, that it finds appropriate.

**Individual Plaintiffs:** The "irreducible constitutional minimum of standing" requires that (1) the plaintiff have suffered an actual or imminent injury in fact that is concrete and particularized; (2) the injury complained of must be fairly traceable to the challenged action of the defendant, rather than resulting from the independent action of a third party not before the court; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife,* 504

---

3. Defendants also argue that the Court should "doubly disregard" the declarations of Garth Corbett and Marisol McNair (docket nos. 264-6,264-7), because, in addition to including the phrase "to the best of my knowledge [,]" Corbett and McNair are, respectively, an attorney and legal assistant working on behalf of the Plaintiffs. Therefore, Defendants argue, these two declarations violate Texas Disciplinary Rule of Professional Conduct 3.08. This argument is without merit. *See* Tex. R.P.C. Rule 3.08(a)(2), cmt.5.

U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ Defendants raise two arguments to challenge the standing of the individual Plaintiffs in this case. First, Defendants argue that the individual Plaintiffs can no longer allege any injury in fact because "all of the Individual Plaintiffs who have IDD and who have expressed a desire to live in the community and receive their services through the HCS waiver program have been provided an HCS slot and are living in the community."[4] Docket no. 244 at 24. Second, Defendants claim that the live complaint "fails to identify any specific rule, policy, eligibility criterion, or method of administration that has resulted in their alleged injury and therefore Plaintiffs have not identified the 'inadequacy that produced the injury in fact.'" Docket no. 244 at 26 (quoting *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

■ Article III limits federal-court jurisdiction to "cases" and "controversies[,]" a limitation which the Supreme Court has interpreted to "demand that 'an actual controversy ... be extant at all stages of review, not merely at the time the complaint is filed.'" *Campbell–Ewald Co. v. Gomez,* —— U.S. ——, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016), *as revised* (Feb. 9, 2016) (*quoting Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)). In general, if intervening circumstances deprive the plaintiff of a "personal stake in the outcome of the lawsuit," the action must be dismissed as moot, *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 478, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990), but "[a] case becomes moot ... 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Campbell–Ewald Co. v. Gomez,* —— U.S. ——, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016) (quoting *Knox v. Serv. Employees Int'l Union, Local 1000,* 567 U.S. 298, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012)). As Plaintiffs pointed out—and Defendants have failed to address or even acknowledge—the "relation-back doctrine" provides that "a suit brought as a class action should not be dismissed for mootness upon tender to the named plaintiffs of their personal claims, at least when ... there is pending before the district court a timely filed and diligently pursued motion for class certification." *Murray v. Fid. Nat. Fin., Inc.,* 594 F.3d 419, 421 (5th Cir.2010); *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1049–51 (5th Cir. Unit A July 1981) (discussing the origins of the rela-

---

**4.** Specifically, Defendants claim that, of the twelve surviving individual Plaintiffs, seven (Linda Arizpe, Leonard Barefield, Patricia Ferrer, Richard Krause, Zackowitz Morgan, Eric Steward, and Vanisone Thongphanh) are now enrolled in the HCS waiver program, docket no. 244-2 at 2-3; an eighth (Maria Hernandez) is being assessed by her physician for her ability to be safely served in the community, *id.* at 3; a ninth (Melvin Oatman) is not eligible for intellectual and developmental disability services, *id.* at 3–4; and the remaining three (Thomas Johnson, Johnny Kent, and Joseph Morrell) met with a service coordinator on July 28 and August 20, 2015, and, on both dates, informed her that they want to remain in the nursing facilities where they currently reside. Docket no. 244-1 at 2-4.

Plaintiffs dispute Defendants' characterizations that Maria Hernandez is actively being transitioned into community care, docket no. 264 at 20-21; Defendants' claims about Melvin Oatman's eligibility for Home and Community-based Services, *id.* at 21–22; and the adequacy of the information Defendants have provided to Thomas Johnson, Johnny Kent, and Joseph Morrell about community-based alternatives to their current, institutional, care. *Id.* at 18–20. Plaintiffs also argue that the individual Plaintiffs who have been transitioned to community-based care remain "at risk for being referred, screened, or readmitted to a nursing facility." *Id.* at 22.

tion-back doctrine in *Sosna v. Iowa,* 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). This doctrine exists to prevent defendants from tactically acceding to the claims of initial plaintiffs in order to stifle class certification and avoid accountability to a broader group. Even if the Court were to assume that the relief that Defendants have provided to some individual Plaintiffs would be sufficient to satisfy the claims of all individual Plaintiffs and warrant dismissal of the case,[5] the fact that this relief was provided long after Plaintiffs began their pursuit of class certification, *see* docket no. 13,[6] would make it improper for the court to dismiss the complaint now for lack of standing.

■ As to Defendants' second argument, that the complaint should be dismissed for lack of standing because Plaintiffs have not identified the "inadequacy that produced the injury in fact[,]" *Lewis,* 518 U.S. at 357, 116 S.Ct. 2174, this argument fails both because it is premature and because Plaintiffs have, in fact, identified the inadequacies that they allege have caused their injuries.[7] Plaintiffs have alleged that, with respect to each of the named Plaintiffs, Defendants have failed to adequately assess their need for specialized services or community-based services, and that Plaintiffs who sought HCS waivers, because of their IDD status, were detained in a years-long waitlist to which non-IDD Medicaid recipients seeking community-based services were not subjected. Docket no. 173 at 38-76. Plaintiffs allege that these practices amounted to violations of the ADA and Rehabilitation Acts' statutory prohibitions of discrimination against with IDD. *Id.* at 77–80.

The individual Plaintiffs have made an adequate showing of injury to preclude a Rule 12(b)( 1) dismissal of their claims.

■ **Organizational Plaintiffs:** Defendants also dispute the standing of the two organizational Plaintiffs in this case, the Arc of Texas, Inc. and the Coalition of Texans with Disabilities, Inc. An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" *Assoc. of Cmty. Orgs. For Reform Now v. Fowler,* 178 F.3d 350, 356 (5th Cir.1999), or associational standing on behalf of its members, if "(a) its members

---

5. To be clear, the record supports no such assumption. It is far from clear that the relief Defendants have provided to some of the individual Plaintiffs is sufficient to vitiate the Article III standing of all of the individual Plaintiffs. At the very least, disputes remain between the parties as to the eligibility of some of the individual Plaintiffs for HCS waiver services, as well as the sufficiency of Defendants' measures to provide information regarding community-based alternatives to individual Plaintiffs who, it is not disputed, still reside in nursing facilities. *See* Docket no. 264 at 18-23 (describing the current status of the individual Plaintiffs).

6. Plaintiffs filed their initial motion seeking class certification (docket no. 13) on January 19, 2011, and subsequently updated the motion (docket nos. 94, 174) to correspond to their amended complaints (docket nos. 63, 173). (From September 27, 2011, to July 23, 2012, and from September 21, 2012, to September 30, 2015, the case was stayed (docket nos. 58, 107, 138, 179, 181, 220).) The first individual Plaintiffs who have transitioned to community-based care were offered Home and Community-based Services waiver slots on September 14,2012, and did not actually enroll or begin receiving services until well thereafter. Docket no. 244–2 at 2.

7. *Cf. Lewis,* 518 U.S. at 357, 116 S.Ct. 2174 (noting, in review of "whether [named plaintiffs'] injuries, and the other findings of the District Court, support the injunction ordered in this case" that "[t]he general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation, with respect to [injuries alleged by named plaintiffs].... That point is irrelevant now, however, for we are beyond the pleading stage.").

would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Defendants argue that the organizational Plaintiffs in this case have failed to make the injury-in-fact showing, both as to the organizations directly and as to any individual members. Docket no. 244 at 22-23.

■■■■ Organizations that seek to establish standing in their own right may satisfy the injury-in-fact requirement by showing a diversion of their resources, but "[n]ot every diversion of resources to counteract the defendant's conduct ... establishes an injury in fact." *N.A.A.C.P. v. City of Kyle, Tex.,* 626 F.3d 233, 238 (5th Cir. 2010). For instance, expenditures of an organization's resources do not satisfy the injury-in-fact requirement when the organization "ha[s] no legally-protected interest in *not* expending [its] resources on behalf of individuals for whom [it] advocates, at least where the only resources 'lost' are the legal costs of the particular advocacy lawsuit." *Ass'n for Retarded Citizens of Dallas v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees,* 19 F.3d 241, 244 (5th Cir.1994); *Spann v. Colonial Vill., Inc.,* 899 F.2d 24, 27 (D.C.Cir.1990) ("[a]n organization cannot ... manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit."); *Louisiana ACORN Fair Hous. v. LeBlanc,* 211 F.3d 298, 305 (5th Cir.2000) (same).

■■■■ The organizational Plaintiffs in this case, however, have followed the Fifth Circuit's "formula for establishing stand-

ing"[8]: Both have shown that they provide counseling and referral services to persons with intellectual and developmental disabilities, *see* docket nos. 70-1 at 1-2 (the Arc of Texas), 70-2 at 3 (the Coalition of Texans with Disabilities), and both have shown that the discrimination they allege has caused them to—distinct from their litigation costs—redirect their organizational resources. *See* docket nos. 70-1 at 3 (the Arc of Texas), 70-2 at 3-4 (the Coalition of Texans with Disabilities); *cf. Cleburne Living Ctr., Inc.,* 726 F.2d at 203; *see also Christy McCarthy, et al. v. Don A. Gilbert, et al.,* No. A-03-CA-231-SS, slip op. at 7 (W.D.Tx. May 23, 2003) available at docket no. 244-3 at 7.

Additionally, the organizational Plaintiffs have met the injury-in-fact requirement for associational standing by producing evidence showing that their members are among those injured by the discrimination that they allege. *See* docket nos. 70-1 at 2, 70-2 at 2-3. The organizational Plaintiffs have also established a community of interest between the groups and the injured members by showing that the missions of the organizational plaintiffs—in their words, "advocating for services and supports that enable people with IDD to live safely and productively in integrated community settings, as opposed to being isolated in an institution"—are relevant to their relief they seek in this litigation. *Humane Soc. of the U.S. v. Hodel,* 840 F.2d 45, 56 (D.C.Cir.1988); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); *Christy McCarthy, et al.,* No. A-03-CA-231-SS, slip op. at 6-8, available at docket no. 244-3 at 6-8. Finally, participation of the members whose injury con-

---

8. *See Cleburne Living Ctr., Inc. v. Cleburne, Texas,* 726 F.2d 191, 203 & n. 16 (5th Cir.1984), *aff'd in part, vacated in part sub nom., City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

fers standing upon an organizational plaintiff is not required where, as here, the organizational plaintiffs seek only declaratory and injunctive relief. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd,* 627 F.3d 547, 550–51 (5th Cir.2010) (citing *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434)); *Hosp. Council of W. Pa. v. City of Pittsburgh,* 949 F.2d 83 (3d Cir.1991) ("The Supreme Court has repeatedly held that a request by an association for declaratory and injunctive relief does not require participation by individual association members.").

Accordingly, the Court rejects Defendants' arguments and concludes that both the Arc of Texas and the Coalition of Texans with Disabilities have established Article III standing to proceed as organizational Plaintiffs in this case.

### 2. Failure to State a Claim

The Federal Rules of Civil Procedure require plaintiffs to include in their complaint "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" and provide that a complaint may be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 8(a)(2), 12(b)(6). In reviewing the sufficiency of a complaint upon a motion under Rule 12(b)(6), the Court must first identify the complaint's factual allegations—which are assumed to be true for purposes of ruling on the 12(b)(6) motion—and distinguish them from any statements of legal conclusion, which are not entitled to the assumption of truth. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 680–81, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Second, the Court must assess whether the assumed-as-true factual allegations set forth a plausible claim to relief. This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense" to determine whether "the well-pleaded facts ... permit the court to infer more than the mere

possibility of misconduct[.]" *Id.* at 679, 129 S.Ct. 1937.

**ADA and Rehabilitation Act:** The Americans with Disabilities Act was passed by Congress with the specific mandate of eliminating discrimination against individuals with disabilities. Title II of the ADA covers discrimination in the provision of public services. *Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 671 (5th Cir. 2004). To state a prima facie case under Title II of the ADA, a plaintiff must allege:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Id.* at 671–72. The Rehabilitation Act incorporates substantially identical elements. *Id.* at 676 n. 8. The Supreme Court has held that Title IPs prohibition on discrimination requires placement of persons with mental disabilities in community settings, rather than in institutions, in certain circumstances, such as:

> when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 587, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Defendants point to a series of cases that follow *Olmstead,* in which

courts have concluded that the failure to provide Medicaid services in a community-based setting may constitute a form of discrimination. *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir.2004); *Townsend v. Quasim*, 328 F.3d 511, 517–18 (9th Cir.2003). Defendants argue that Plaintiffs have failed to state a claim of discrimination in violation of Title II because they don't identify any Medicaid service that Texas makes available in institutional settings but does not offer in community-based settings.

■ Defendants' argument is undercut by the plain language of the ADA and *Olmstead*, that "[i]n the ADA, Congress ... referred expressly to 'segregation' of persons with disabilities as a 'for[m] of discrimination,' and to discrimination that persists in the area of 'institutionalization.'" *Olmstead*, 527 U.S. at 589 & n. 1, 119 S.Ct. 2176. Defendants' argument is also contrary to the regulatory authority implementing Title II and the Rehabilitation Act, which prohibits discrimination in terms of the failure to maintain community-based services, methods of administration that screen qualified individuals from community-based services, and other manifestations of discrimination. *See, e.g.,* 28 C.F.R. § 35.130(b)(8). ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."); 28 C.F.R. § 41.51(d) (recipients of federal funds must "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.").

Segregation from community-based services is not cured by the fact that the community-based services exist; the existence of such services means nothing to individuals who are excluded from them. Plaintiffs have sufficiently alleged that they are qualified individuals within the meaning of Title II and the Rehabilitation Act, and, with the exception of Mr. Oatman, Defendants do not appear to dispute Plaintiffs' allegations on this point. Docket no. 173 at 2-3, 5-9, 36-76. Plaintiffs also allege that Defendants prohibit those with developmental disabilities who are residing in or at risk for placement in nursing care facilities from pursuing residential assistance services or community-based habilitation services, except by lining up behind tens of thousands of other applicants on an overburdened Home and Community-Based Services waiting list—a hurdle which individuals with developmental disabilities residing in state-supported living centers and private intermediate care facilities, and individuals with physical disabilities who reside in nursing homes, need not clear to obtain similar services. Docket no. 173 at 18-19, 38, 40, 41-43, 45, 47-50, 52, 55, 57, 63, 66, 68-69, 71, 73-74, 76. Plaintiffs also allege that, because "Texas significantly and chronically underfunds its service system[,]" people with mental retardation or related conditions are not provided access to community-based services with reasonable promptness. *Id.* at 19–20. These allegations are sufficient to state claims of discrimination under Title II and the Rehabilitation Act, under the formula outlined in *Olmstead.*

Accordingly, dismissal of Plaintiffs' Title II and Rehabilitation Act claims would be improper.

### 3. Section 1983 Claims

Defendants argue that Plaintiffs' claims under the Medicaid Act and the Nursing Home Reform Amendments Act should be

dismissed because neither statute creates a private cause of action under 42 U.S.C. § 1983. Section 1983 allows private individuals to bring claims against state actors for violations of rights created by federal statutes, but "[i]t is essential to a private enforcement action under § 1983 ... that the federal statute in question *unambiguously* give rise to privately enforceable, substantive rights." *Johnson v. Hous. Auth. Of Jefferson Par.*, 442 F.3d 356, 359 (5th Cir.2006). Defendants also argue that Plaintiffs have failed to sufficiently plead violations of either statute.

The Supreme Court has articulated a three-part test within which the Court evaluates whether Congress, in enacting the statutory provisions in question, intended to create rights enforceable by private parties:

> (1) Congress must have intended that the provision in question benefit the private plaintiff; (2) the right assertedly protected by the statute must not be so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the states, with the asserted right couched in mandatory rather than precatory terms.

*Id.* (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). The Supreme Court has taken care to distinguish between the creation of "rights" that are enforceable through Section 1983, and "broader and vaguer 'benefits' or 'interests,' " which are an insufficient basis for a private action under Section 1983. *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 704 (5th Cir.2007) (discussing *Gonzaga*). The char-

acter of a particular provision as a Spending Clause statute neither establishes nor forecloses the private enforceability of that statute. *Cf. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) ("Boren Amendment" provision of Medicaid Act created private right in health care providers); *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (statute that conditioned state's receipt of federal adoption assistance funds on state's formulation of "plan" to make "reasonable efforts" to keep children out of foster homes not privately actionable because it "impose[d] only a rather generalized duty on the State"); *Gonzaga Univ.*, 536 U.S. at 280–82, 122 S.Ct. 2268 (summarizing prior cases, noting that "[o]ur more recent decisions, however, have rejected attempts to infer enforceable rights from Spending Clause statutes.").

Plaintiffs' Medicaid Act claims focus on two statutory provisions, 42 U.S.C. §§ 1396a(a)(8) and 1396n(c).[9] The complaint also cites to an implementing regulation codified at 42 C.F.R. § 435.930(a). Plaintiffs' claims under the Nursing Home Reform Amendments Act arise from two statutory provisions, 42 U.S.C. §§ 1396r(b)(3)(F)(i) and 1396r(e)(7)(A) and (B). The complaint also cites implementing regulations codified at 42 C.F.R. §§ 483.100 to 483.138.

■ **Section 1396a:** Plaintiffs' "Reasonable Promptness" claim alleges a violation of Section 1396a(a)(8), which requires that states furnish Medicaid benefits to eligible individuals with "reasonable promptness[.]" The Fifth Circuit has held that this requirement "creates a private cause of action enforceable under § 1983" under the standards set forth by the Su-

---

**9.** Plaintiffs are no longer pursuing their "comparability" claim under 42 U.S.C. § 1396a(a)(10)(B). Docket no. 264 at 4 n.2.

preme Court in *Blessing, Wilder,* and *Gonzaga. Romano v. Greenstein,* 721 F.3d 373, 377–80 (5th Cir.2013) (citing *S.D. ex rel. Dickson v. Hood,* 391 F.3d 581, 602 (5th Cir.2004) (under *Gonzaga* standard, 42 U.S.C. § 1396a(a)(10)(A) (which the complaint also cites in support of Plaintiffs' "Reasonable Promptness" claim) is enforceable via Section 1983)). Defendants argue that Plaintiffs' claim under Section 1396a(a)(8) should nonetheless be dismissed because the HCS waiver program that Plaintiffs seek access to is "full" and that, therefore, Plaintiffs are not "eligible" and are outside the protections of Sections 1396a(a)(8) and (10)(A). *See, e.g., Bryson v. Shumway,* 308 F.3d 79, 88 (1st Cir.2002) (Section 1396a(a)(8) supports Section 1983 "reasonable promptness" claim on behalf of those eligible for a waiver slot, i.e., "[t]hose patients who are on the waiting list and for whom slots are available"); *Christy McCarthy, et al. v. Don A. Gilbert, et al.,* No. A–03–CA–231–SS, slip op. at 14–16 (W.D.Tx. May 23, 2003) available at docket no. 244-3 at 14-16 ("Because the plaintiffs have not been determined 'eligible,' they have not satisfied the first prong of *Blessing,* as they are not among the class of individuals Congress intended to benefit.").

This argument is undercut by the representations that Defendants make in support of their mootness and standing arguments, where they asked the Court to dismiss Plaintiffs' claims for lack of injury because the individual named Plaintiffs are already enrolled in the HCS waiver program, and because "[f]or the 2016-17 biennium, the Texas Legislature appropriated $84,541,298 to fund an additional 1,300 HCS slots for this target group[.]" *Cf.*

Docket no. 244 at 2, 13, 24-25, 48-49.[10] In essence, Defendants seek to persuade the Court that Plaintiffs are simultaneously not eligible for and already enrolled in the HCS waiver program. However, as discussed above, Defendants may not deprive Plaintiffs of standing by (Plaintiffs allege, ineffectively) curing the injuries alleged by the named individual Plaintiffs. Similarly, notwithstanding Defendants' steps toward curing these injuries, members of the Plaintiff organizations—as well as class members, in the event of class certification—retain an interest, secured by Title II, the Rehabilitation Act, and Section 1396a(a)(8), in reasonably prompt and non-discriminatory access to any HCS waiver program slots for which they are eligible. The Fifth Circuit has recognized that Section 1396a(a)(8) provides a basis for Plaintiffs, through Section 1983, to pursue a claim to vindicate that interest, and Plaintiffs have pled facts sufficient to state a claim under that statute.

**Section 1396n:** Section 1396n(c)(2), at subparagraphs (B) and (C), imposes two related requirements on states that seek HCS waivers. First, subparagraph (B) requires that participating states provide an evaluation of the need for institutional care to individuals who may require it but who also may be eligible for community-based care under a waiver program. Second, subparagraph (C) requires that the state provide information about any feasible community-based alternatives available under the waiver to the individuals described in subparagraph (B). The Fifth Circuit has never directly considered the question of whether Section 1396n(c) creates rights enforceable by Medicaid recipients

---

**10.** To the extent that Defendants may argue that putative class members are ineligible notwithstanding the program's expansion because of the lengthy HCS waitlist, this argument is fatally undercut by Defendants' representations that members of the putative class no longer need seek HCS waiver slots through the waitlist, "but may bypass the interest list and enroll in HCS directly from the [nursing facility] (or from the community if being diverted from a[ ] [nursing facility] )." Docket no. 244 at 2, 13, 48-49.

through Section 1983. Defendants argue that, because Section 1396n(c) imposes requirements upon the states regarding the contents of their waiver applications, it falls short of the first *Blessing* prong. Defendants support this argument with an order entered in *Christy McCarthy, et al. v. Don A. Gilbert, et al*, No. A-03-CA-231-SS (W.D.Tx. May 23, 2003) slip op. available at docket no. 244-3. However, that order is in tension with the Fifth Circuit's ruling in *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581 (5th Cir.2004), where the Court of Appeals analyzed a provision of the Medicaid Act similar to Section 1396n(c), and found it to create a private right of action when read in light of 42 U.S.C. § 1320a-2. *Dickson*, 391 F.3d at 603.

Other courts have discussed the history of Section 1320a-2, and its bearing on the *Blessing* analysis for Medicaid Act statutes, explaining that the statute now codified at Section 1320a-2 was enacted to overturn an aspect of the Supreme Court's decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). *Ball v. Rodgers*, 492 F.3d 1094, 1111 (9th Cir.2007); *Planned Parenthood Arizona, Inc. v. Betlach*, 899 F.Supp.2d 868, 878 (D.Ariz.2012). In *Suter*, the Supreme Court held that a Social Security Act provision [11] was not enforceable under Section 1983 because it could be "read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary"—essentially the argument that Defendants advance in this case. *Suter*, 503 U.S. at 363, 112 S.Ct. 1360. However, in enacting the "*Suter* fix,"[12] Congress provided that "[i]n an action brought to enforce a provision of [the Social Security Chapter, of which Section

1396n(c) is a part], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan[.]" 42 U.S.C. § 1320a-2. Reading Section 1396n(c) in light of Section 1320a-2—and remaining mindful of the centrality of Congressional intent to the *Blessing* analysis—it is clear that Congress intended, at the very least, that Section 1396n(c) not be rendered unenforceable through Section 1983 merely because it specifies the required contents of a state plan. This conclusion is consistent with the Fifth Circuit's holding in *Dickson*, and requires this Court to undertake a more searching consideration of whether Section 1396n(c) meets the standards set forth in *Blessing* and *Gonzaga*.

The first stage of the inquiry outlined in *Blessing* and refined in *Gonzaga* goes to "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga*, 536 U.S. at 285, 122 S.Ct. 2268; *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. The Fifth Circuit has held that statutory language in a provision neighboring section 1396n(c) requiring that "[a] State Plan must provide for making medical assistance available ... to all individuals" who meet certain eligibility criteria is "precisely the sort of 'rights-creating' language identified in *Gonzaga* as critical to demonstrating a congressional intent to establish a new right." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir.2004) ("'it [is] difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant [Medicaid Act] language— 'A State Plan must provide' from the 'No person shall' language of Titles VI and IX'

**11.** The statutory provision at issue in *Suter* was enacted under the short title "Adoption Assistance and Child Welfare Act of 1980" and codified at 42 U.S.C. § 671(a)(15).

**12.** *Planned Parenthood Arizona, Inc.*, 899 F.Supp.2d at 878.

which was held up in *Gonzaga* as the prototypical rights-creating language." (quoting *Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir.2004))). Furthermore, the subject of the requirement of 1396n(c) reflects an individual rather than an aggregate focus, requiring that the state provide, "with respect to individuals" who are qualified, the assessment and information outlined in subparagraphs (B) and (C). *Cf. Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 703 (5th Cir.2007) (42 U.S.C. § 1396a(a)(30)(A), which requires state plans to structure utilization of and payment for services to attract sufficient providers such that services under the plan are equal to services available to the general population, had aggregate, rather than individual, focus, and therefore did not contain "rights creating" language). The language of Section 1396n(c)(2), in imposing a requirement upon state plans that the state assure the Secretary that certain individuals receive evaluations of their need for institutional care and information about community-based alternatives, reflects a congressional intent to create a right in those individuals to such evaluations and information.

Turning to the second and third *Blessing* factors, that right to evaluation and information is neither vague nor amorphous, and it is mandatory. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 512, 514–15, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (statutory requirement that state adopt "reasonable" and "adequate" reimbursement rates not too vague to create enforceable right; "[i]f the Secretary is entitled to reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory ... a State is on notice that it cannot adopt any rates it

chooses and that the requirement that it make 'findings' is not a mere formality.' "); *see also Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 431, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (construing vagueness prong).

 Plaintiffs' complaint alleges violations of Section 1396n(c)'s rights to assessment and information about community-based alternatives to nursing facility care, and Plaintiffs allege that these violations contributed to the unnecessary institutionalization in nursing facilities that they allege they suffered, as well as the deterioration to their health and autonomy that they allege flowed from their improper placement in nursing facilities. Docket no. 173 at 28-29, 38, 40, 42, 45, 47, 55, 57, 59, 61, 63, 66, 68, 71, 73, 76. Finally, Defendants also argue that Plaintiffs have failed to state a claim because the HCS waiver program is full, and Defendants are therefore no longer bound to meet Section 1396n's requirements with respect to waiver services that are no longer "feasible" or "available[.]" *Makin v. Hawaii*, 114 F.Supp.2d 1017, 1027–28 (D.Haw.1999). As above, this argument fails because, according to Defendants, the HCS waiver program has in fact been expanded to accommodate an additional capacity.

 **Section 1396r:** Finally, Defendants challenge Plaintiffs' claims under the Nursing Home Reform Amendments Act (NHRA), alleging violations of 42 U.S.C. §§ 1396r(e)(7)(A) and (B).[13] Defendants argue that these provisions cannot support a Section 1983 claim because they do not create rights in Medicaid recipients, but impose requirements on nursing facilities, which are actionable by Medicaid recipients exclusively through the griev-

---

**13.** Plaintiffs clarify in their opposition to Defendants' motion to dismiss that they do not assert any independent claim under Section 1396r(b)(3)(F), but cite it merely "because

§ 1396r(e)(7)(A)(i) cross references to that section in order to fully define and clarify the nature and extent of the preadmission screening program[.]" Docket no. 264 at 81 n.64.

ance process mandated by 42 U.S.C. § 1396r(e)(7)(A) and 42 C.F.R. § 483.204 and outlined in state law. Defendants' arguments against the Section 1983 enforceability of these provisions by Medicaid recipients mirror their arguments against the private enforceability of the other provisions of the Medicaid Act at issue in this case: that the complaint relies upon violations of NHRA provisions that regulate nursing homes, prescribe the contents of state Medicaid Plans, or empower the Secretary to promulgate regulations regarding the requirements of state plans. Defendants' arguments, as above, fail to overcome 42 U.S.C. § 1320a–2, the weight of persuasive authority from other jurisdictions, and this Court's own assessment of the structure, purpose, and requirements of the NHRA.

The Fifth Circuit has not clearly addressed the question of whether the NHRA is enforceable, via Section 1983, by Medicaid recipients against states, although it has "assume[d], without deciding" that this is the case. *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 n. 5 (5th Cir.2003) (citing *Rolland v. Romney*, 318 F.3d 42, 51–56 (1st Cir. 2003)). The first and third circuits have found that the NHRA is enforceable by Medicaid recipients against the state. *Grammer v. John J. Kane Reg'l Centers–Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009) ("The FNHRA are replete with rights-creating language."); *Rolland*, 318 F.3d at 53 ("after clearly identifying those it seeks to protect, the [NHRA] goes on to endow them with particular rights, utilizing 'rights-creating' language."). The second circuit, considering a related question, dismissed a Section 1983 NHRA claim brought by health care providers and commented that "[i]t is clear from the plain language of this provision that it was not intend[ed] to benefit the putative plaintiff[s]—here the health care providers.... Rather, the provision is obviously intended

to benefit Medicaid beneficiaries." *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 143–44 (2d Cir.2001) (internal quotation marks omitted). Plaintiffs also note a handful of district courts that are in accord. *Martin v. Voinovich*, 840 F.Supp. 1175, 1200 (S.D.Ohio 1993); *Joseph S. v. Hogan*, 561 F.Supp.2d 280, 304 (E.D.N.Y.2008); *Tinder v. Lewis Cty. Nursing Home Dist*, 207 F.Supp.2d 951, 955 (E.D.Mo.2001).

This Court agrees with the persuasive authority from other jurisdictions finding that the NHRA creates rights, actionable through Section 1983, in Medicaid recipients. The NHRA provisions at issue in this case outline the "Preadmission Screening and Annual Resident Review" ("PASARR") process" required by the statute to assess the level of care required by individuals with intellectual and developmental disabilities who are admitted to nursing facilities. *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 385 (5th Cir.2003). The statute uses mandatory language to impose an obligation upon the state mental health authority to provide these screenings to individuals, creating a right to individualized assessments of the need for institutional care, to be conducted before an individual is committed to receive care in an institutional setting. Section 1396r(e)(7)(A) and (B) outline the "State requirements for preadmission screening and resident review," describing the circumstances under which states are required to administer that review, requiring the state to assess "whether or not the resident ... requires the level of services" provided in the institutional setting, requiring states to review their determination upon changes in the resident's condition, and prohibiting the state from delegating its screening function to a nursing facility or affiliated entity. Section 1396r(b)(3)(F)(i) prohibits a nursing home from admitting any mentally ill resident

"unless the State mental health authority has determined ... prior to admission that, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility[.]" Taken together, these requirements vindicate the overarching purpose of the statute: "to 'quell overutilization of nursing home care for those who are not in need of institutionalization.'" *Grant*, 324 F.3d at 385 (quoting *Rolland v. Cellucci*, 52 F.Supp.2d 231, 234 (D.Mass.1999)).

The authorities relied upon by Defendants are inapposite to this analysis. With two exceptions, all of them involve claims against private nursing home defendants, not state actors.[14] The two remaining cases involve provisions of the NHRA not at issue in this case. *Terry v. Health and Hosp. Corp. of Marion Cnty.*, No. 10–cv–607, slip op. at 15 (S.D.Ind. Mar. 29, 2010) (dismissing Section 1983 claims alleging violations of the "quality of care" provisions codified at 42 U.S.C. § 1395i–3); *Sparr v. Berks Cty.*, No. 02–cv–2576, 2002 WL 1608243, at *3 (E.D.Pa. July 18, 2002) (finding, without mentioning *Gonzaga*, that NHRA was intended to benefit plaintiff nursing home resident, but finding no implied private right of action arising from NHRA "Bill of Resident Rights" provision under standard set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)).

Finally, Defendants argue that Plaintiffs have failed to state a cognizable NHRA claim. First, Defendants argue that the relevant provisions of Section 1396r impose no obligations upon the state, but only regulate nursing facilities. This argument fails in the face of the plain language of the statute, which outlines "State requirements for preadmission screening and resident review"; provides that "the State must have in effect a preadmission screening program" that meets the relevant requirements; and notes that the failure of the Secretary to develop pertinent minimum criteria "shall not relieve any State of its responsibility to have a preadmission screening program under this subparagraph or to perform resident reviews[.]" 42 U.S.C. § 1396r(e)(7)(A). Second, Defendants argue that Plaintiffs' "specialized services claim should be dismissed because the specialized services obligation imposed upon the states is lim-

**14.** *Stewart v. Bernstein*, 769 F.2d 1088, 1092 (5th Cir.1985) (finding no cause of action implied under Medicaid Act against private nursing home and its administrator); *Prince v. Dicker*, 29 Fed.Appx. 52, 54 (2d Cir.2002) (same); *Schwerdtfeger v. Alden Long Grove Rehab. & Health Care Ctr., Inc.*, No. 13 C 8316, 2014 WL 1884471, at *5 (N.D.Ill. May 12, 2014) ("Here, [Defendant] is a private nursing facility, and thus, is not a state actor subject to Section 1983."); *Baum v. N. Dutchess Hosp.*, 764 F.Supp.2d 410, 425 (N.D.N.Y. 2011) ("FNHRA does not clearly and unambiguously authorize a private federal cause of action for nursing home residents against private nursing homes. FNHRA lacks the rights-creating language critical to reflecting Congress's intent to create a new federal right or individual entitlement that would be enforceable under § 1983."); *Duncan v. Johnson–Mathers Health Care, Inc.*, No. 5:09–CV–00417–KKC, 2010 WL 3000718, at *10 (E.D.Ky. July 28,2010) (dismissing Section 1396r claims against nursing home); *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1332 (N.D.Ga.2000) ("the Court finds little evidence of Congress' intent to create a private cause of action that would entitle nursing home residents to sue nursing homes to enforce Medicare and Medicaid participation standards."); *Estate of Ayres ex rel. Strugnell v. Beaver*, 48 F.Supp.2d 1335, 1339–40 (M.D.Fla.1999) (remanding claims against private nursing home defendants to state court upon finding that no statutory private right of action—and thus no federal question jurisdiction—exists under the Medicare and Medicaid Acts); *Nichols v. St. Luke Ctr. of Hyde Park*, 800 F.Supp. 1564, 1567 (S.D.Ohio 1992) (finding that Medicaid Act creates no private right of action enforceable against private nursing home defendants).

ited to those services outlined in 42 C.F.R. § 483.440(a)(1), and not the subsequent subsections (b) through (f) of Section 483.440. This argument fails because it is contrary to the plain language of Section 483.440, which states that the required continuous active treatment program "includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart"—i.e., Part 483, Subpart I, which encompasses subsections (b) through (f). 42 C.F.R. § 483.440 (a)(1); *Rolland v. Patrick*, 483 F.Supp.2d 107, 114 (D.Mass. 2007) (noting that Section 483.440(a) incorporates "all active treatment standards 'described in this subpart' ").

## CONCLUSION

It is therefore ORDERED that the State of Texas's Motion to Dismiss the Claims of the United States of America (docket no. 242) and Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (docket no. 244) are DENIED.

In light of Plaintiffs' representations that they are no longer pursuing their Medicaid Act "comparability" claims, or their claims against Governor Abbott, such claims are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.